**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHANNON WICKER,<br>    *Plaintiff*,<br><br>    v.<br><br>CAPTAIN PAPOOSHA, *et al.*,<br>    *Defendants*. | No. 3:24-cv-01640 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

In this action, Shannon Wicker ("Plaintiff") sued Daniel Papoosha, Craig Washington, and Lieutenant Dawson (collectively, "Defendants") under 42 U.S.C. § 1983. Mr. Wicker alleges that these Defendants violated his procedural and substantive due process rights related to his Security Risk Group ("SRG") designation. Mem. in Supp. of Mot. for Summ. J. ("Mot. for Summ. J.") at 1, ECF No. 26-1.

Defendants now move for summary judgment on three grounds: (1) Mr. Wicker failed to exhaust his administrative remedies as to his asserted claims; (2) there is no genuine dispute of material facts and Defendants are entitled to judgment as a matter of law; and (3) in any event, Defendants are entitled to qualified immunity. *Id.*

For the reasons explained below, Defendants' motion for summary judgment is **GRANTED**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**[1]

Mr. Wicker is currently a sentenced inmate in Department of Correction ("DOC")

custody at the Osborn Correctional Institution, having been sentenced on May 14, 2025. *See*

DOC, Inmate Locator, available at

https://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=303518 (last accessed April 7,

2026). But at the time of the allegations underlying this case, he had not been sentenced, and thus

he was a pretrial detainee. *Id.* Mr. Wicker's allegations relate to events that occurred while he

was housed at the New Haven Correctional Center ("NHCC"). Defs.' L.R. 56(a)(1) ¶¶ 1-2, 4,

ECF No. 26-6.

Mr. Wicker had previously been in DOC custody, and during that previous incarceration,

Mr. Wicker was in the SRG program. *Id.* ¶¶ 15-16 (indicating Mr. Wicker had been designated

as an SRG member on December 20, 2016), 54. On June 20, 2024, Mr. Wicker returned to DOC

---

[1] The factual background is drawn from Defendants' Local Rule 56(a)(1) Statement of Material Facts to the extent the facts set forth are supported by evidence in the record. *See* Local Rule 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party.").

In response to Defendants' Motion for Summary Judgment, Mr. Wicker submitted a filing entitled "Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment." Opp'n at 32-39, ECF No. 29. Notwithstanding the title given to this submission, the filing does not comply with Local Rule 56(a)(2) because Mr. Wicker's denials are not accompanied by specific citations to evidence in the record. *See* Local Rule 56(a)(3).

In his sur-reply, Mr. Wicker recognizes this failure, and he asks the Court to forgive his mistake because of his *pro se* status. And in that filing, Mr. Wicker also attempts to file an "Updated Local Rule 56(a)(2) Additional Material Facts." Sur-Reply at 8-9, ECF No. 32. Mr. Wicker's updated statement, however, does not consistently cite to record evidence, either. Defendants object both to Mr. Wicker's filing a sur-reply without leave of the Court, and his attempt to excuse his failure to adhere to the local rules. *See* Obj. to Sur-Reply, ECF No. 33.

Based on Mr. Wicker's failure to adhere to the Local Rules, the Court deems admitted Defendants' Statement of Facts where those facts are supported by the record evidence. *See* Local Rule 56(a)(1). Mr. Wicker received notice of the filing requirements in the Defendants' Notice to Self-Represented Litigant Concerning Motion for Summary Judgment as Required by Local Rule of Civ. Pro. 56(b). *See* Notice, ECF No. 26-7.

That said, given Mr. Wicker's status as a *pro se* litigant and his attempt to correct his mistake, in determining the existence of any genuine disputes of material fact, the Court has also considered, where appropriate, Mr. Wicker's amended facts, his opposition, and the record evidence.

custody. *Id.* ¶ 4. When Mr. Wicker returned to DOC custody, Mr. Wicker had not yet completed his SRG program from his previous incarceration. *Id.* ¶ 56. The SRG program is a five-phase program, with Phase 1 being the most restrictive and Phase 5 being the least restrictive. *Id.* ¶¶ 43-45. Thus, upon his readmission at NHCC, Mr. Wicker was placed in the Restrictive Housing Unit ("RHU") pending an SRG designation hearing. *Id.* ¶¶ 5, 56. Daniel Papoosha is the DOC's SRG coordinator. *Id.* ¶ 42.

Once transferred to the RHU, Mr. Wicker learned he was under investigation for a pending SRG profile. *Id.* ¶ 6. On June 20, 2024, Mr. Wicker signed the notification of this investigation. *Id.* ¶ 7.

A hearing on Mr. Wicker's SRG designation was scheduled for June 27, 2024. *Id.* ¶ 10. On June 26, 2024—the day before his hearing—Mr. Wicker was interviewed. *Id.* ¶ 8. During that interview, Mr. Wicker learned the evidence that would be presented against him, and Mr. Wicker declined the opportunity to present witnesses or to receive the assistance of an advisor. *Id.* ¶¶ 8-9.

At Mr. Wicker's June 27, 2024, designation hearing, Lieutenant Dawson served as the hearing officer. Mot. for Summ. J., Ex. B, at 8, ECF No. 26-3. He considered evidence including Mr. Wicker's previous SRG affiliation and his social media posts while he was released. Defs.' L.R. 56(a)(1) ¶¶ 10-12, 17. Mr. Wicker confirmed at this hearing that he did not request an advisor to assist him during the hearing and did not wish to present witnesses. *Id.* ¶¶ 13-14. Mr. Wicker also indicated that the spelling of his name was different from how it appeared on the list at the hearing. *Id.*

After the hearing, Lieutenant Dawson recommended that Mr. Wicker remain on SRG status. *Id.* ¶ 17. Mr. Wicker signed the SRG Membership Designation. *Id.* ¶ 18. On June 28,

2024, Mr. Wicker was transferred to the Corrigan Correctional Center. Mot. for Summ. J., Ex. A, at 2, ECF No. 26-2.

On July 9, 2024, Mr. Wicker appealed the SRG designation decision. Defs.' L.R. 56(a)(1) ¶ 33.[2] The entirety of Mr. Wicker's appeal reads:

> I was redesignated as a Blood and placed in SRG they have a paper with the name "Bishop" on it but my name is spelled "Bishup" two totally different spellings I disaffiliated myself year [sic] ago and I keep telling them that's not me. From my understanding they got that paper well over 6 months ago and it was off somebody else phone that has nothing to do with me. I was told by a staff members [sic] that the evidence must be within 6 months and none of the evidence is I don't understand how after 5 ½ years I'm still considered a threat to [the] population when my name [hasn't] even been spoken through these jails there [are] no hits that I sent I haven't been in a fight since December 2018 and before that I haven't had a fight since entering SRG there is nothing showing that I'm a threat so can you please fix this and take me out the program I don't even mind sitting on the blue card while you watch me

Mot. for Summ. J., Ex. C, at 23, ECF No. 26-4. District Administrator Washington is the Level 2 administrative remedies coordinator. Defs.' L.R. 56(a)(1) ¶ 31, ECF No. 26-6. Washington denied Mr. Wicker's appeal on August 14, 2024. Mot. for Summ. J., Ex. C, at 23, ECF No. 26-4. In his denial, Washington wrote:

> An extensive review of your request for Security Risk Group Designation Appeal was completed. The Hearing Officer's finding was reasonable based on information and evidence presented at a formal hearing on June 27, 2024.
>
> No due-process failure occurred in the disposition of your Security Risk Group Designation Hearing. There is no reason to modify the Hearing Officer's decision. For these reasons, your appeal of Security Risk Group Member designation is denied.

---

[2] During the relevant time, Mr. Wicker filed three grievances/appeals. Defs.' L.R. 56(a)(1) ¶¶ 33, 39, ECF No. 26-6. Two of those grievances are unrelated to this action. *Id.* ¶¶ 39-40 (describing the grievances as relating to cleaning supplies and an incident related to the shower).

4

> Be advised that the decision of the District Administrator is not subject to further appeal.

*Id.* at 22.

After his designation, Mr. Wicker entered the SRG program at Phase 3. Defs.' L.R. 56(a)(1) ¶¶ 45, 57.

On October 15, 2024, Mr. Wicker filed this lawsuit. Compl., ECF No. 1.

On October 18, 2024, the Court granted Mr. Wicker's motion to proceed *in forma pauperis*. Order, ECF No. 9.

On March 7, 2025, the Court issued an Initial Review Order. Initial Review Order, ECF No. 14. In that order, the Court allowed Mr. Wicker to proceed on two claims: (1) a Fourteenth Amendment procedural due process claim against Dawson, Washington, and Papoosha; and (2) a substantive due process claim arising from the alleged punitive placement and conditions in the SRG Unit against Papoosha. *Id.* at 20. All other claims, including against other Defendants, were dismissed.[3] *Id.*

On April 17, 2025, counsel entered a notice of appearance for Defendants. Not. of Appearance, ECF No. 15.

On May 27, 2025, Defendants answered Mr. Wicker's complaint. Answer, ECF No. 17.

On August 1, 2025, Mr. Wicker moved for a preliminary injunction. Mot. for Preliminary Injunction, ECF No. 20.

---

[3] To the extent Mr. Wicker argues in favor of his equal protection claim proceeding to trial, the Court dismissed that claim at the Initial Review Stage. Initial Review Order at 17-18 (dismissing "Mr. Wicker's Fourteenth Amendment equal protection claims . . . as implausible"). The Court, however, acknowledges that Mr. Wicker's confusion may stem from a sentence later in the Court's order, which referenced an equal protection claim proceeding. *Id.* at 20. Despite the inclusion of that sentence, however, the Court previously substantively analyzed and dismissed Mr. Wicker's equal protection claim.

On August 11, 2025, Defendants opposed that motion. Opp'n, ECF No. 22.

On August 21, 2025, Mr. Wicker filed a reply in support of his motion. Reply, ECF No. 23.

On September 2, 2025, the Court denied Mr. Wicker's motion for a preliminary injunction because, among other reasons, Mr. Wicker failed to demonstrate the elements of irreparable harm or likelihood of success. Order, ECF No. 24.

On December 5, 2025, Defendants moved for summary judgment. Mot. for Summ. J., ECF No. 26.

On January 7, 2026, Mr. Wicker filed an opposition to the motion for summary judgment. Opp'n, ECF No. 29; *see also* Order, ECF No. 28 (granting Mr. Wicker's motion for extension of time to respond to Defendants' motion for summary judgment).

On January 14, 2026, Defendants filed a reply in support of their motion for summary judgment. Reply, ECF No. 30.

On February 10, 2026, Mr. Wicker filed a sur-reply. Sur-Reply, ECF No. 32. On February 17, 2026, Defendants filed an objection to Mr. Wicker's sur-reply. Obj., ECF No. 33. On March 10, 2026, Mr. Wicker filed a response in support of his sur-reply. Resp., ECF No. 34. On March 24, 2026, Defendants filed an objection to Mr. Wicker's response. Obj., ECF No. 35.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

Mr. Wicker claims the Defendants violated both his procedural due process and his substantive due process rights. As to the former, Mr. Wicker argues that his SRG designation hearing was procedurally flawed. And for the latter, he argues that his readmission to the SRG program when he returned to DOC custody and the conditions that he experienced while in the SRG program amounted to punitive conditions that violated his substantive due process rights.

The Defendants argue that (1) Mr. Wicker failed to exhaust his administrative remedies; (2) Mr. Wicker's claims fail on the merits; and (3) Defendants are entitled to qualified immunity.

The Court will address each issue in turn.

### A.       The Procedural Due Process Claim

The Due Process Clause of the Fourteenth Amendment protects both a right to "substantive" due process and "procedural" due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). A claim of violation of procedural due process must be analyzed by (1) asking whether there exists a liberty or property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the State were constitutionally sufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam) ("As for the Due Process Clause, standard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient."). In the prison context, which involves persons whose liberty interests are already severely restricted because of their confinement, a prisoner cannot show a cognizable deprivation of "liberty" unless he can show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The liberty interest analysis under "*Sandin* does not apply to pretrial detainees." *Benjamin v. Fraser*, 264 F.3d 175, 188, 190 (2d Cir. 2001) (citing *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974) and *Hewitt v. Helms*, 459 U.S. 460 (1983) (qualified on other grounds by *Sandin*, 515 U.S. at 482-84)).

Relevant here, the level of procedural protection required depends on the purpose of the hearing. *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987) ("[T]he level of procedural protection differs according to the purpose of the confinement."). For an administrative proceeding, the inmate is entitled only to "some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding" the matter. *Hewitt*, 459 U.S. at 476. The proceeding that decides whether an inmate

should be transferred to administrative segregation "must occur within a reasonable time following an inmate's transfer." *Walker v. Quiros*, 11-CV-00082 (MPS), 2014 WL 7404550, at *10 (D. Conn. Sept. 30, 2014) (citing *Hewitt*, 459 U.S. at 476 n.8).

For a disciplinary proceeding, an inmate is entitled to advance written notice of the charge, adequate time to prepare a defense, a written statement of the reasons for the disciplinary action taken, and a limited opportunity to present witnesses and evidence in his defense. *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974). Both standards require "some evidence" to support the decisions to place an inmate in administrative or punitive segregation. *See Elder v. McCarthy*, 967 F.3d 113, 129 (2d Cir. 2020) (explaining that a disciplinary determination must be supported by some reliable evidence of guilt).

It is not settled which standard applies when analyzing a pretrial detainee's hearing related to the SRG program. "Other courts 'have considered that a pretrial detainee may have a liberty interest in being free from his restrictive conditions of the SRG Program according to the procedural protections set forth in *Wolff*.'" *Saxon v. Connecticut*, No. 3:24CV807 (AWT), 2026 WL 381854, at *6 (D. Conn. Jan. 27, 2026) (quoting *Pena v. Czeremcha*, No. 3:24-CV-938 (SVN), 2024 WL 4388277, at *8 (D. Conn. Oct. 2, 2024)). Because the Court concludes that Mr. Wicker's hearing satisfies the more stringent standard of *Wolff*, however, the Court need not determine which standard applies. *See id.* (holding that "[t]he court need not resolve the issue here because, even under the more demanding procedures of *Wolff*, . . . there is no genuine issue as to the fact that [the plaintiff] received the process due to him") (internal quotation marks and citation omitted).

First, there is no genuine dispute of material fact that Mr. Wicker received advance written notice of the charge. The evidence shows that Mr. Wicker received notice of the charge

on June 20, 2024, when he was readmitted to custody. Pl. L.R. 56(a)(2) ¶¶ 6-8, ECF No. 29. Mr. Wicker disputes the veracity of this evidence because the notice contains a contradictory date— at the top, the notice refers to June 21, 2024. Ex. B at 7; Reply at 9, ECF No. 30 (Defendants acknowledging this discrepancy and attributing it to a potential scrivener's error).

But that discrepancy is not consequential. The issue instead is the substantive sufficiency of the notice. "Even in cases involving administrative segregation based upon a prisoner's membership in a gang, sufficient notice cannot simply recite vague or conclusory allegations of 'recent tension . . . involving gang activity.' Rather, to be sufficient, notice must inform the defendant of more specific facts underlying the allegation that he is suspected of gang membership, for example, a report of contact with known gang members." *Taylor v. Rodriguez*, 238 F.3d 188, 193 (2d Cir. 2001).

Here, Mr. Wicker's notice read: "Inmate Wicker, Shannon . . . was designated as a member of the Bloods security risk group on 12/20/2016 and has yet to complete SRG member programming. As a result, an SRG readmission assessment hearing needs to be conducted to determine the status of inmate Wicker's designation." Ex. B at 7. Although referencing its purpose as a "readmission assessment," this notice is deficient as "written notice of the charges . . . to inform [Mr. Wicker] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 564.

But prison officials supplemented it in their June 26, 2024 interview with Mr. Wicker, memorialized in a section of the Security Risk Group Member Determination. Ex. B at 8. The unrebutted evidence here shows that prison officials interviewed Mr. Wicker the day before the hearing, during which Mr. Wicker learned of the evidence that would be used against him. Pl. L.R. 56(a)(2) ¶ 8 (Mr. Wicker admitting those facts). That evidence included previous affiliation,

11

public social media accounts, and confidential information. Thus, there is no genuine dispute of material fact that the notice was sufficient.

Second, there is no genuine dispute of material fact that Mr. Wicker had adequate time to prepare a defense. At the latest, Mr. Wicker's notice was fully realized on June 26, 2024, and Mr. Wicker's hearing occurred on June 27, 2024. *Wolff* itself confirms that twenty-four hours' notice is sufficient to prepare for a hearing. *Wolff* 418 U.S. at 564 ("At least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee."). Mr. Wicker makes no persuasive argument that he did not have adequate time to prepare. Thus, there is no genuine dispute of material fact that Mr. Wicker had adequate time to prepare a defense.

Third, there is no genuine dispute of material fact that Mr. Wicker received a written statement of the reasons for the disciplinary action taken. Mr. Wicker admits he signed the SRG Membership Designation decision. Pl. L.R. 56(a)(2) ¶ 18. This decision provides the reasoning for the recommended designation. Thus, there is no genuine dispute of material fact that Mr. Wicker received a written statement of the reasons for the action taken.

Fourth, there is no genuine dispute of material fact that Mr. Wicker had a limited opportunity to present witnesses and evidence in his defense. In his initial filing, Mr. Wicker denied that he declined the opportunity to present witnesses and to present his position. Pl. L.R. 56(a)(2) ¶¶ 9, 14. But in his sur-reply Mr. Wicker clarifies that he "meant to admit that fact" because "he had just been admitted to [NHCC] so he had no witnesses to present." Sur-Reply at 2, ECF No. 32. This admission is aligned with the record evidence, which includes the Security Risk Group Member Determination report that indicates that Mr. Wicker declined to present witnesses. Mot. for Summ. J., Ex. B, at 8, ECF No. 26-3. Thus, there is no genuine dispute of

12

material fact that Mr. Wicker had a limited opportunity to present witnesses and evidence in his defense.

Finally, on this record, there is no genuine dispute of material fact that Mr. Wicker's designation was supported by "some reliable evidence." *Fluker v. Kelly*, No. 23-307, 2024 WL 506578, at *2 (2d Cir. Feb. 9, 2024) (summary order) (holding that inmate's Facebook posts, "in the aggregate, satisfied the 'some reliable evidence' requirement" to designate inmate as an SRG member); *see Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985) (stating that the due process "standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced . . .'"); *see also Elder*, 967 F.3d at 129 ("[W]e have required that such disciplinary determinations be supported by some 'reliable evidence' of guilt.").

The evidence included Mr. Wicker's public social media posts and past SRG information. Pl. L.R. 56(a)(2) ¶ 12 (admitting in part and objecting in part that "the hearing officer was presented with information regarding the Plaintiff's past SRG membership, social media post, and other information"). For example, the Security Risk Group Member Determination report shows that "[e]vidence gathered by the SRG Unit at Central Office confirms [Mr. Wicker's] continued affiliation with the Bishop Bloods." Mot. for Summ. J., Ex. B, at 8, ECF No. 26-3. It continued, "[a] public social media account belonging to [Mr. Wicker] was discovered under the name 'Pueblo Bishup,' and other supporting evidence has been gathered [redacted] to confirm his continued affiliation." *Id.*

While Mr. Wicker argues that the decision to place him into the SRG program was predetermined, that the photographs identified are from eight months to five years before the hearing, and that the person identified in the social media posts was not him because Mr. Wicker

13

spells his name differently, Opp'n at 4-5, 21, those issues are not germane here. *See Hill*, 472 U.S. at 454 ("Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.").

Therefore, even "constru[ing] the facts in the light most favorable to" Mr. Wicker and "resolv[ing] all ambiguities and draw[ing] all reasonable inferences against" Defendants, *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (internal quotation marks and citation omitted), there is no genuine dispute of material fact suggesting that the Defendants violated Mr. Wicker's Fourteenth Amendment right to procedural due process in connection with his SRG designation hearing.

Accordingly, the Court will grant summary judgment for Defendants on this claim.

**B.      The Substantive Due Process Claim**

Administrative segregation measures do not "violate substantive due process where prison officials subject[] pretrial detainees to such measures in response to specific evidence that those detainees posed a risk to institutional security, and where the measures were not excessive in relation to that purpose." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 56 (2d Cir. 2017). In *Almighty Supreme Born Allah*, the Second Circuit held that prison officials violated a pretrial detainee's substantive due process when they placed him in administrative segregation "solely on the basis of his prior assignment to (and failure to complete) the Administrative Segregation program during a prior term of incarceration." *Id.* at 57.  Those officials, the Court held, "adhered reflexively to a practice that did not allow for individualized consideration of [the plaintiff's] circumstances and that required him to be placed in Administrative Segregation regardless of his actual threat, if any, to institutional security." *Id.* Even if a pretrial detainee has

been properly subject to administrative segregation, substantive due process applies to the conditions imposed on the detainee, which must be reasonably related to a legitimate government purpose. *Id.* at 55.

Mr. Wicker separately claims that his time in SRG as a pretrial detainee violated his substantive due process rights. In this respect, Mr. Wicker challenges both his placement in SRG on his readmission to DOC custody and the conditions he experienced within the program. Examples of the conditions that he viewed as punitive include restricted phone calls, commissary use, programming, medical treatment, as well as discrimination. Opp'n at 4-5. Here, though, the Defendants make a compelling argument that Mr. Wicker failed to properly exhaust his substantive due process claim.

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies before a court may hear their case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted"); *see also Ross v. Blake*, 578 U.S. 632, 632-36 (2016) (applying the PLRA and noting that it "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions" (quoting 42 U.S.C. § 1997e(a))). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," meaning that an inmate must properly follow all steps required by the administrative review process applicable to the institution in which he is

confined. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("In *Woodford*, we held that to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' . . . rules that are defined not by the PLRA, but by the prison grievance process itself." (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006))); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly" (quoting *Woodford*, 548 U.S. at 90)). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (internal citation omitted)).

An inmate's failure to exhaust administrative remedies is only excusable if the remedies are, in fact, unavailable. *See Ross*, 578 U.S. at 642 ("Under § 1997e(a), the exhaustion requirement hinges on the availability of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." (internal citation and quotation marks omitted)). The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal citation and quotation marks omitted).

The Supreme Court in *Ross* identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. "Next, an administrative

16

remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.*

Finally, an administrative remedy is not "available" when "prison administrators thwart inmates

from taking advantage of a grievance process through machination, misrepresentation, or

intimidation." *Id.* at 644. These circumstances are seemingly not exhaustive, *see Williams v.*

*Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), but the Court is guided by these illustrations, *see*

*Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19,

2016).

Exhaustion of administrative remedies is an affirmative defense. Thus, the Defendants

carry the burden of proof. *See Jones*, 549 U.S. at 216 ("We conclude that failure to exhaust is an

affirmative defense under the PLRA, and that inmates are not required to specially plead or

demonstrate exhaustion in their complaints."). When the defendants establish that administrative

remedies were not exhausted before the inmate filed suit, the plaintiff must then show that the

process was not available to him under *Ross* or present evidence that he did exhaust his

administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce

a defendant has adduced reliable evidence that administrative remedies were available to the

plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the

plaintiff must then 'counter' the defendant's assertion by showing exhaustion, unavailability,

estoppel, or special circumstances." (internal citation and quotation marks omitted)).

As for how to properly exhaust, "it is the prison's requirements, and not the PLRA, that

define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. For most claims, a plaintiff

in DOC custody must exhaust remedies through the grievance procedures set forth in DOC

Administrative Directive 9.6 ("A.D. 9.6"); *see also Riles v. Buchanan*, 656 F. App'x 577, 579

17

(2d Cir. 2016) (summary order) ("The Connecticut Department of Correction ('DOC') requires inmates to submit grievances in accordance with Administrative Directive 9.6 ('A.D. 9.6')").

Before an inmate can file a grievance under A.D. 9.6, he must first seek "informal resolution." Decl. of District Administrator Washington, Ex. A, Administrative Directive 9.6 § 6.a.i, ECF No. 26-4. The inmate must attempt to "resolve the issue verbally" and, if this effort is unsuccessful, must "submit a written request via form CN 9601." *Id.* If these informal resolution steps are unsuccessful, the inmate may file a Level 1 grievance using form CN 9602, which must be submitted within thirty calendar days after the occurrence or discovery of the cause of the grievance. A.D. 9.6 § 6.a.ii.4. The grievance must include documentation of the inmate's written request to resolve the matter informally or an explanation of why such documentation is not attached. *Id.* at § 6.a.ii.2, 2(a). The Unit Administrator is required to respond in writing to a Level 1 grievance within thirty business days of receipt of the grievance. A.D. 9.6 § 6.b.i.3. An inmate may appeal to Level 2 if the Unit Administrator either denies a Level 1 grievance or fails to respond to the grievance in a timely manner. A.D. 9.6 § 6.b.ii.

When the Unit Administrator denies a Level 1 grievance, the Level 2 appeal must be filed within five calendar days of the inmate's receipt of the Unit Administrator's decision. *Id.* at § 6.b.ii.1. When the Unit Administrator fails to respond to a Level 1 grievance in a timely manner, the Level 2 appeal must be filed within sixty-five calendar days of the date the Level 1 grievance was filed. *Id.* at § 6.b.ii.2. Level 3 appeals are restricted to appeals of Level 2 decisions that challenge department policy or the integrity of the grievance procedure, or appeals to which there has been an untimely response by the District Administrator. *Id.* at § 6.b.iii.1. An inmate must file a Level 3 grievance using form CN 9605 within five calendar days of the Level 2 denial, or, if the Level 3 form was submitted "as a result of an inmate not receiving a response to

18

a CN 9604, Inmate Grievance Appeal Form – Level 2 within 30 business days, [it] must be filed within 65 calendar days of filing the CN 9604, Inmate Grievance Appeal Form – Level 2." *Id.* at § 6.b.iii.2.

Distinct from the general grievance process detailed above, appealing a Security Risk Group Member Designation requires following the process in Administrative Directive 9.6 § 7. An inmate may appeal an initial Security Risk Group member designation by completing form CN 9606 and depositing it in the Administrative Remedies box within fifteen calendar days of receipt of the decision. *Id.* at § 7.a.iii. The District Administrator will respond in writing within fifteen days of receipt of the appeal. *Id.* at § 7.a.iv.3.c.

Here, Mr. Wicker filed his only relevant appeal on July 9, 2024, when he appealed the SRG designation decision. Defs.' L.R. 56(a)(1) ¶ 33. As stated above, the entirety of Mr. Wicker's appeal reads:

> I was redesignated as a Blood and placed in SRG they have a paper with the name "Bishop" on it but my name is spelled "Bishup" two totally different spellings I disaffiliated myself year [sic] ago and I keep telling them that's not me. From my understanding they got that paper well over 6 months ago and it was off somebody else phone that has nothing to do with me. I was told by a staff members [sic] that the evidence must be within 6 months and none of the evidence is I don't understand how after 5 ½ years I'm still considered a threat to [the] population when my name [hasn't] even been spoken through these jails there [are] no hits that I sent I haven't been in a fight since December 2018 and before that I haven't had a fight since entering SRG there is nothing showing that I'm a threat so can you please fix this and take me out the program I don't even mind sitting on the blue card while you watch me

Mot. for Summ. J., Ex. C, at 23, ECF No. 26-4. Washington denied Mr. Wicker's appeal on August 14, 2024. *Id.*; Defs.' L.R. 56(a)(1) ¶ 31. In his denial, Washington wrote:

> An extensive review of your request for Security Risk Group Designation Appeal was completed. The Hearing Officer's finding

19

was reasonable based on information and evidence presented at a formal hearing on June 27, 2024.

No due-process failure occurred in the disposition of your Security Risk Group Designation Hearing. There is no reason to modify the Hearing Officer's decision. For these reasons, your appeal of Security Risk Group Member designation is denied.

Be advised that the decision of the District Administrator is not subject to further appeal.

*Id.* at 22.

Because Mr. Wicker's substantive due process claim relates to both his pre-hearing placement in RHU and his post-hearing conditions in the SRG program, to properly exhaust his administrative remedies Mr. Wicker was required to follow the procedure under Administrative Directive 9.6. Viewed in the light most favorable to Mr. Wicker, Mr. Wicker did not do so. There is no record evidence that Mr. Wicker sought informal resolution or followed the leveled grievance system in Administrative Directive 9.6.

Moreover, Mr. Wicker's appeal is substantively a challenge to the result of his SRG designation hearing, and his appeal does not challenge either his initial placement in RHU or his conditions within the program. Rather, his appeal concerns the sufficiency of the evidence at his hearing and his subsequent placement in the SRG program. Mr. Wicker admits as much in his responses to Defendants' motion for summary judgment. *See* Opp'n at 7 ("The Plaintiff tried to utilize this office to challenge the decision made against him at his June 27, 2024 hearing on July 9, 2024."); *see also* Sur-Reply at 5 ("The Plaintiff's only claim derives from the SRG Designation Hearing and nothing else[.]").

Having established that Mr. Wicker failed to properly exhaust his administrative remedies, Mr. Wicker must persuasively argue that the process was unavailable due to the

circumstances set forth in *Ross*. *See Ross*, 578 U.S. at 644 (finding that an administrative procedure is unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."). Mr. Wicker argues both that the process was functionally a "dead end" for him because of institutional corruption and also that he was deterred from exercising his right to that process because Washington denied his appeal of the SRG hearing decision. Opp'n at 3-4, 8, 23, 25. Mr. Wicker claims that Washington's conclusion that "no due-process failure occurred" thwarted his efforts from moving forward with exhaustion. Neither argument is persuasive.

Mr. Wicker makes no compelling argument why the denial of his appeal of his SRG hearing decision would thwart his efforts to exhaust his separate claims, especially where Mr. Wicker makes clear that his appeal was limited to the SRG hearing decision. Moreover, Mr. Wicker provides no evidence of institutional corruption generally or in this instance specifically. Mr. Wicker's assertions are conclusory and unsupported, which are insufficient to create a genuine issue of fact. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact."). Thus, the Court determines that there is no genuine dispute of material fact that the grievance process was unavailable to Mr. Wicker.

Therefore, there is no genuine dispute of material fact that Mr. Wicker failed to exhaust his administrative remedies with respect to the Fourteenth Amendment substantive due process claim.

Accordingly, the Defendants' motion for summary judgment as to Mr. Wicker's substantive due process claim will be granted.[4]

## IV.    CONCLUSION

For the reasons explained herein, the Defendants' motion for summary judgment is **GRANTED**.

The Clerk of Court is respectfully directed to enter judgment in favor of the Defendants and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 15th day of May, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

4 Because Mr. Wicker's claims will be dismissed, the Court need not address whether the Defendants are entitled to qualified immunity. *See Duamutef v. Hollins*, 297 F.3d 108, 113 n.1 (2d Cir. 2002) ("[O]nce we decide that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity . . . ."); *see also Feaster v. U.S. Bureau of Prisons*, 37 F. App'x 15, 17 (2d Cir. 2002) ("Having affirmed the dismissal of Feaster's due process claim because of his failure to exhaust , and having vacated and remanded his retaliation and state law claims, this Court declines to reach the question of qualified immunity.").